844 P.2d 566

**STATE of Arizona, Appellee,**

v.

**Alfonso Raymond SALAZAR, Appellant.**

**No. CR–88–0135–AP/PC.**

Supreme Court of Arizona, En Banc.

Dec. 17, 1992.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Phoenix, Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Dardis & Hippert, P.C. by Frederic J. Dardis, Tucson, for appellant.

## OPINION

MOELLER, Vice Chief Justice.

### JURISDICTION

Defendant, Alfonso Raymond Salazar, was convicted by a jury of first degree murder, kidnapping, and first degree burglary. He was sentenced to death for the murder and to concurrent terms of imprisonment for the burglary and kidnapping. Appeal of the murder conviction is automatic; we accepted late appeals of the other convictions. Pending appeal, defendant filed a Rule 32 petition for post-conviction relief based on alleged ineffective assistance of counsel at trial and sentencing. We stayed the appeal pending resolution of the Rule 32 proceeding. After an extensive evidentiary hearing, the trial court denied Rule 32 relief. Defendant's petition to review that ruling was consolidated with the appeal, and we treat the consolidated matters as a single appeal. We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4033.

### FACTS AND PROCEDURAL HISTORY

The victim in this murder case is a fragile, 83–year–old woman, 5 feet tall, 89 pounds, who wore a patch over a sightless eye and lived alone. On the night of July 25, 1986, she was murdered in her home by beating and strangulation. The murderers gained forced entry to her home by prying metal security bars from a window.

On the day of the murder, defendant Salazar earned some money doing odd jobs. He and his co-defendant, Michael Wayne Davis, then used the money to buy tequila and gin which they consumed during the course of the day. Around midnight, they attended a party at the home of James Teran, who provided them with some beer. On their way back to Davis' house, where

they both lived, they broke into the victim's home by prying wrought iron bars from a window. Later that same evening, Davis' aunt, Maria Snyder, noticed that defendant, who was not wearing a shirt, had scratch marks on his chest. The day after the murder, concerned relatives of the victim asked police to check on her. The police found her body on top of an overturned table. Her TV set was still blaring. She had been severely beaten and had also been strangled with a telephone cord. Palm prints, fingerprints and footprints were found in and around the house and on the wrought iron bars that had been pried from the window.

Approximately 2 months later, defendant was arrested. While his story was to change at trial, he initially denied ever being in the victim's house. At trial, defendant claimed that he and Davis entered the victim's home on a whim, out of curiosity, and that they believed the home was unoccupied. After Davis pried the metal bars from the window and they entered, defendant said he used a pocket lighter to guide himself through the home which, he said, was dusty, full of junk and completely silent. While "looking" in a file drawer, something that he thought was a ghost touched his arm and he fled the house in terror. After that, he said, Davis caught up with him outside and admitted that he had just killed someone in the house. Though defendant claimed not to have believed Davis at the time, he nevertheless removed and discarded his shoes at that point because he knew that his footprints were all over the victim's home. He then fled barefoot across desert terrain. The following day, he said he moved out of the Davis household after learning from TV news that there really had been a murder.

The state's version of defendant's role the night of the murder was considerably different than defendant's and was based, in large part, on physical evidence. A fingerprint examiner established that defendant's prints were found on the window grating that had been pried loose, on a telephone book inside the point-of-entry window, and on three file cabinets in the murder room. An identification technician testified concerning the bloody handprints found on one of the three file cabinets.

An expert tracker testified that zig-zag pattern shoeprints were found both *under* the body and partially *on* the body. These prints were made by a Tiger brand running shoe, which defendant admitted owning. Because the shoe prints were both under and on top of the body, they show that the shoe wearer was present both before and after the murder.

The medical examiner established that blood spatter patterns showed that the victim was beaten while on her bed and that she was still alive when she was dragged to the floor. Ultimately, she died atop an overturned table. The victim had defensive wounds on her arms and hands, and was beaten so severely that her nose was broken. She was strangled so fiercely that her Adam's apple was crushed.

The jury, obviously rejecting defendant's testimony, found him guilty. At the sentencing hearing, the trial court found that the murder was committed in an especially cruel, heinous or depraved manner within the meaning of A.R.S. § 13–703(F)(6). *See* Appendix at 420–421, 844 P.2d at 587–588. Although the state urged that the murder was also committed for pecuniary gain within the meaning of A.R.S. § 13–703(F)(5), the trial court did not so find. *Id.* In addition to the statutory mitigating circumstances enumerated in A.R.S. § 13–703(G), the trial court considered 4 additional potentially mitigating factors, but found them insufficient to support a reduction of the death penalty to life imprisonment. The additional non-statutory mitigating factors considered were: (1) lack of a prior felony conviction; (2) alcohol and substance use prior to the break-in; (3) jury instructions on felony murder; and (4) whether defendant personally killed the victim. On the last point, the court found that defendant: was a major participant in the felony committed, and that his involvement led to either the actual participation in the strangulation or the other violence perpetrated on the victim, or indicated reckless indifference to human life by the defendant's actions, when in his presence the victim was

being murdered. *Id.* at 420–421, 844 P.2d at 587–588.

Based on its findings, the trial court sentenced defendant to death for the murder and to terms of imprisonment for robbery and burglary. The appeal and the Rule 32 petition followed.

## ISSUES

The following issues are presented:

1. Whether the trial court erred in permitting witness Victoria Bode, a criminalist, to testify regarding blood stains found at the murder scene.

2. Whether the trial court erred in failing to grant defendant's motion for change of venue.

3. Whether the trial court erred in admitting Exhibit 16, a photograph of the victim.

4. Whether the trial court erred in allowing Detective Lowe's footprint comparison testimony.

5. Whether the trial court erred in precluding expert testimony on the effects of intoxication.

6. Whether the jury was properly instructed.

7. Whether there was a proper unanimous verdict on the murder charge.

8. Whether the trial court erred in "death-qualifying" potential jurors.

9. Whether the Arizona death penalty is constitutional and was properly applied to defendant.

10. Whether the trial court erred in denying defendant's petition for post-conviction relief, which was based on grounds of ineffective assistance of counsel.

11. Whether this court should discontinue its practice of conducting proportionality reviews in death penalty cases.

## DISCUSSION

### 1. The Witness Bode

Victoria Bode is a criminalist who testified that red smears on the side of a filing cabinet were made by human blood. This was one of the filing cabinets on which the defendant's fingerprints had been found. Defendant contends her testimony should have been excluded on the grounds that she was a non-disclosed witness.

■ On any evidentiary matter, the trial court has considerable discretion, *Burgbacher v. Mellor*, 112 Ariz. 481, 483, 543 P.2d 1110, 1112 (1975), which will not be disturbed absent a clear abuse. *State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). In *State v. Birdsall*, 23 Ariz.App. 454, 533 P.2d 1191 (1975), the court held that, absent a showing of prejudice, the trial court erred in excluding testimony of a state's witness solely because the witness' name was not on the witness list, when the witness' participation was otherwise disclosed to the defense.

■ Defendant argues that failure of the state to list Bode as a witness on the witness list itself prejudiced him because Bode's testimony undercut his claim that he never was on the side of the room where the murder occurred. To determine prejudice, the totality of circumstances should be considered. Long before trial, when counsel for both sides were reviewing potential evidence, defense counsel noticed a smear on the filing cabinet in one of the photographs. He asked the state to test it. The state did have Bode test it and gave defense counsel a copy of her report. Apparently, he later overlooked it in his later pretrial preparation. However, repeated references to Bode being called as a witness were made during proceedings in open court, all with no demurral from defense counsel. For example, the state specifically asked that Bode's name be added to the list of witnesses to be identified for the jury. The next trial day, Bode's name was read as part of the court's effort to determine if any of the prospective jurors knew any of the witnesses who might be called. The state referred to the smear on the filing cabinet, the one to which Bode later testified, in its opening statement.

When defense counsel first objected to Bode's testimony, he overlooked the fact that he had her report in his file. Notwithstanding, the trial court allowed defense

counsel to interview Bode and also declared a recess so that the smear could be tested by a defense expert. As Bode's testimony finally was received, however, it was only to the effect that the stain was made of human blood; Bode did not tie the stain to the blood of the victim or, for that matter, to the defendant. Defendant testified that his hands often bled from cuts received while working, thus suggesting the possibility that he may have left his own blood on the file drawer.

Under the circumstances, the trial court was well within its discretion in not excluding Bode's testimony.

## 2. Change of Venue

The murder received considerable media coverage. Defendant argues that this coverage required the trial court to grant a change of venue based on pre-trial publicity. He contends the jury pool was tainted and that voir dire examination of the jury panel not only failed to ameliorate the taint, but exacerbated it.

■ A motion for change of venue presents a discretionary call which will not be overturned on appeal absent a clear showing of abuse of discretion by the trial court and resultant prejudice to the defendant. *State v. Greenawalt*, 128 Ariz. 150, 162–63, 624 P.2d 828, 840–41, *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). The defendant has the burden of demonstrating the probability of an unfair trial. *Id.* 128 Ariz. at 162, 624 P.2d at 840. Rule 10.3(b), Ariz.R.Crim.P., 17 A.R.S., provides: "Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial."

■ Defendant argues that some jurors had prior knowledge of the case from newspaper or television reports and were therefore disqualified. "An examination of the jurors, through voir dire process, is an effective means by which to determine the effects or influence of pretrial publicity on the jurors." *Greenawalt*, 128 Ariz. at 163, 624 P.2d at 841. In the instant case, the trial court conducted such an examination and determined that any juror who was seated was not disqualified by reason of pretrial publicity.

■ Defendant also argues that the trial court's general questions in the presence of all prospective jurors caused cross-contamination of the panel. In the presence of all prospective jurors, the trial judge asked if any had prior knowledge of the case. Several jurors said they had heard of the case through news reports or at the University of Arizona, where they worked and where the victim had been employed. The trial judge then discontinued the general questioning and conducted individual voir dire of each juror who indicated any prior knowledge. This was a proper and effective guard against cross-contamination.

■ Defendant also contends that coverage during the trial deprived him of a fair jury. We have not been directed to any motion in the trial court based on coverage during the trial and we have not independently found any in the record. The claim, even if not waived, is meritless. The judge repeatedly admonished the jurors to avoid media stories concerning the trial. When a newspaper article did appear during the trial, the judge questioned the jury to determine if any of them had read it. None had.

## 3. The Photograph, Exhibit 16

■ Exhibit 16 is a photograph of the victim as she was found in her home. Defendant argues that the photograph is both irrelevant and unduly prejudicial. The trial judge has discretion to decide whether photographs are substantially more probative than prejudicial and, absent an abuse of that discretion, the decision will not be disturbed on appeal. *State v. Mohr*, 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970); *see also* Rule 403, Ariz.R.Evid., 17A A.R.S.

■ The trial court's inquiry is two-fold. First, the photographs must be relevant. Photographic evidence is relevant if it aids the jury in understanding any issue in dispute. Second, the court must in-

quire whether the photographs would tend to incite passion or inflame the jury. In the event that they are inflammatory, the court balances their probative value against their potential to cause unfair prejudice. *Amaya–Ruiz,* 166 Ariz. at 170, 800 P.2d at 1278. If the purpose of the offer is to assist the jury in understanding testimony, photographs may be admissible even if they are gruesome. *State v. Schad,* 129 Ariz. 557, 571–72, 633 P.2d 366, 380–81 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).

■ Exhibit 16 shows the position of the victim in relation to the bed, the tablecloth speckled with blood, the file cabinet with the bloody smear, and the other objects referred to in the testimony. It also shows the telephone cord around the victim's neck, the phone receiver placed back on its cradle after the strangulation, the footprint next to the body, and the blood on the victim's face and neck. The medical examiner used the photo to demonstrate how the details at the murder scene helped him conduct his investigation and to reach conclusions regarding the victim's death. The photo was also probative on the issue of intent.

We conclude that the trial court did not abuse its discretion in admitting Exhibit 16.

### 4. Footprint Evidence

Defendant filed a motion in limine to exclude the footprint testimony of Detective Lowe, but withdrew it prior to trial. When defense counsel withdrew the motion, he stated "after a more thorough review of Detective Lowe's testimony at the Davis trial, at this time I withdraw that motion. I have no objection to him talking about those prints, assuming the scope is no broader than what we heard at the Davis trial." Sound tactical reasons may well have suggested withdrawal of the motion in limine, because Lowe's testimony arguably could place the co-defendant Davis, rather than defendant, on the victim's bed.

■ Notwithstanding defendant's acquiescence to the Lowe testimony in the trial court, defendant argues on appeal that it should have been excluded because Lowe was not qualified to testify concerning the footprints. Putting aside for a moment defendant's post-trial claim of ineffective assistance of counsel, defendant's argument at this point on appeal must necessarily be that, although he agreed to the admissibility of Lowe's testimony at trial, the trial court should, nevertheless, have excluded it *sua sponte.* On this state of the record, we review defendant's claim only to determine whether fundamental error has occurred. *State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). There is no fundamental error. Lowe had been trained in tracking by Border Patrol Agents. As a police officer, he had investigated numerous burglarized premises to determine points of entry. His testimony addressed the location of the prints around the victim's home, the direction the individual making the prints was travelling, and whether the individual was walking or running.

"Whether a witness is competent to testify as an expert is a matter primarily for the trial court and largely within its discretion." *State v. Dixon,* 153 Ariz. 151, 155, 735 P.2d 761, 765 (1987) (citing *Englehart v. Jeep Corp.,* 122 Ariz. 256, 258, 594 P.2d 510, 512 (1979)). There was no error here, let alone fundamental error.

### 5. Expert Testimony on Intoxication

■ Defendant wanted Dr. Crago to "testify about the general effects of alcohol on the human body, what it does physiologically in terms of whether or not it can affect a person's ability to reason ..." The trial court rejected such testimony. Defendant argues that Dr. Crago's testimony would have corroborated his own testimony and would have provided the necessary foundation for an intoxication instruction (although an intoxication instruction was given).

This court has repeatedly held "that the effect of alcohol intoxication is an area within the common knowledge and experience of the jury, and therefore, no expert testimony is needed to assist the trier of

fact." *State v. Hicks,* 133 Ariz. 64, 71, 649 P.2d 267, 274 (1982); *see also State v. Laffoon,* 125 Ariz. 484, 486, 610 P.2d 1045, 1047 (1980). In *Hicks,* this court went on to hold that "it is proper for a trial court to preclude psychiatric testimony relating to the effect of alcohol upon the ability to form specific intent." 133 Ariz. at 71, 649 P.2d at 274.

We also reject defendant's argument that Dr. Crago's testimony would have corroborated his own testimony. Dr. Crago had no first-hand knowledge of defendant's condition on the night of the murder, nor did he have any familiarity with defendant's personal alcohol abuse problem, if any. We find no error.

### 6. Jury Instructions

Defendant raises 10 claims relative to jury instructions. Before discussing each specifically, we deal with a more general objection of the defendant. Defendant's appellate counsel asserts that "[s]ettlement of the jury instructions was conducted off the record, without objection by defense counsel" and that this failure "has hampered the analysis of the jury instructions on this appeal." (Appellant's Opening Brief, pp. 2–3; *see also* Appellant's Reply Brief, p. 14, contending that the record is inadequate "[b]ecause the final settlement of jury instructions was conducted off the record.") Contrary to these assertions, the jury instructions were settled on the record (R.T. 12/11/87, pp. 2–26) after they were first informally discussed off the record pursuant to stipulation and with the defendant present. This is a perfectly proper procedure. Defense counsel was given full opportunity to make a complete record on jury instructions and did so to the extent then deemed appropriate. We turn now to the specific claims relative to the instructions.

### A. *Lesser Included Offenses of First Degree Murder*

■ Defendant argues that the trial court erred in failing to instruct the jury on second degree murder. Defendant fails, however, to demonstrate how the evidence supports such an instruction.

■ The state proceeded on dual theories of premeditated and felony murder. Defendant concedes there are no lesser included offenses of felony murder. *See State v. LaGrand,* 153 Ariz. 21, 30, 734 P.2d 563, 572 ("It is well established that no lesser included offense to felony murder exists because the *mens rea* necessary to satisfy the premeditation element of first degree murder is supplied by the specific intent required for the felony."), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). At trial, defendant claimed, both in testimony and in argument, that he was not in any way responsible for the victim's death. He never claimed that he had killed her but lacked premeditation, nor will the record support such a finding. Because defendant's theory of the case denies all involvement in the killing, and no evidence provides a basis for a second degree murder conviction, the instruction was properly refused. When the record is such that defendant is either guilty of the crime charged or not guilty, the trial court should refuse a lesser included instruction. *State v. Schroeder,* 95 Ariz. 255, 259, 389 P.2d 255, 257–58, *cert. denied,* 379 U.S. 939, 85 S.Ct. 347, 13 L.Ed.2d 350 (1964). Had the jury here accepted defendant's version of events, it should have acquitted, not convicted of second degree murder.

### B. *Premeditation Instruction*

■ Although defendant did not object to the premeditation instruction in the trial court, he argues on appeal that it should not have been given. Because defendant failed to object at trial, all claims of error are waived unless the error rises to the status of fundamental error. *Gendron,* 168 Ariz. at 154, 812 P.2d at 627. Given the evidence in this case, including the method of entry and the physical evidence concerning what occurred in the house, the argument that a premeditation instruction was unwarranted is fanciful and meritless.

## C. *Voluntary Intoxication*

Defendant asserts that the trial court should have provided a jury instruction "which would outline the legal effects and consequences of voluntary intoxication upon the charged offense." The trial court did just that. The intoxication instruction read:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

The instruction given was given at defendant's request. The supplemental instruction requested by defendant was unnecessary.

## D. *Instruction on Armed Burglary*

At trial, defendant objected to the armed burglary instruction on the sole ground there was no evidence that either he or Davis possessed a dangerous instrument while entering or leaving the house. The trial court correctly overruled that objection, observing that it would be sufficient for armed burglary if a dangerous instrument was possessed while remaining in the house unlawfully. On appeal, defendant's objection has been expanded. He now argues that no burglary instruction at all should have been given because there "was no showing that [defendant] entered the ... residence on anything more than a whim. It was not conclusively proven that he had any intent, subjective or objective, to commit a felony at the time he entered the residence." This argument accords preclusive effect to the defendant's version of the evidence. Jury instructions are not determined by such a unilateral view. There was no error.

## E. *Flight Instruction*

Defendant argues that the evidence does not support the flight instruction because his departure from the crime scene was not precipitated by an attempt to avoid law enforcement officials. He argues that simply leaving the scene of a crime is not "flight."

If the evidence shows a defendant's manner of leaving the scene of a crime reveals a consciousness of guilt, even in the absence of pursuit, an instruction on flight is permissible. *State v. Lujan*, 124 Ariz. 365, 371, 604 P.2d 629, 635 (1979) (flight instruction proper where defendant and accomplices ran away from the scene of a stabbing immediately after it occurred even though not being pursued by law enforcement officials). Defendant ran, not walked, from the crime scene. A short distance away, he removed his shoes and discarded them and then ran barefoot across desert terrain. He did this because "I knew my shoe prints were all over the house and I didn't want nothing to do with it, you know, anything that—if he [co-defendant] was telling the truth [about killing a woman in the house]." Because defendant's actions can certainly be read as revealing a consciousness of guilt, the flight instruction was properly given.

## F. *"Theory of the Case" Instruction*

Defendant argues that it was error for the trial court to refuse to instruct the jury on his theory of the case, namely, that he left the residence before the murder, which was thereafter committed by his co-defendant. The trial court rejected the instruction, noting that it merely restated concepts that were already included within the felony murder instruction.

When a jury is properly instructed on the applicable law, the trial court is not required to provide additional instructions that do nothing more than reiterate or enlarge the instructions in defendant's language. *State v. Barker*, 94 Ariz. 383, 388, 385 P.2d 516, 519 (1963). Defendant's theory of the case was encompassed within the felony murder instruction. In fact, defense counsel agreed that the requested instruc-

tion was merely the converse of the felony murder instructions. We find no error.

### G. *Instruction Regarding Co–Defendant*

Co-defendant Davis was tried and convicted in a separate trial before defendant's trial. Defendant asserts that the jury should have been instructed as to the existence of the co-defendant and the disposition of the case against him. The trial court refused that instruction, but did instruct the jury on principles of accountability involving accomplice liability.

■ The guilt or innocence of a co-defendant is not relevant to the issue of the guilt or innocence of the accused and is therefore properly excluded. *State v. Corrales*, 131 Ariz. 471, 472, 641 P.2d 1315, 1316 (App.1982). An instruction that a co-defendant exists is likewise not relevant to the guilt or innocence of the defendant on trial. Moreover, the jury was well aware that Davis existed because defendant testified that the two of them entered the house together and that Davis admitted to murdering the victim after defendant had allegedly fled the house. We find no error.

### H. *Kidnapping as a Predicate Offense*

■ Defendant claims that the court erred in instructing the jury that kidnapping was one of the predicate offenses for felony murder. Defendant contends the felony murder doctrine is inapplicable when the felony is an offense necessarily included in the charge of homicide. *See State v. Essman*, 98 Ariz. 228, 235, 403 P.2d 540, 545 (1965). Whatever the merits of that argument and the present viability of *Essman*, we find no error in the present case. First, defendant made no objection when the instructions were discussed and settled. The error, if any, was therefore waived. Second, the facts of this case do not fit defendant's argument. Unlike the problem presented by assault (*see Essman*, 98 Ariz. at 235, 403 P.2d at 545), it is possible to commit murder without kidnapping. Nor is this a case in which the record plainly establishes that the kidnapping and murder were conceptually identical, occurring as part of the same act. Instead, the kidnapping occurred when the victim was beaten on her bed and dragged down to the floor. The murder occurred later, when she was strangled on the floor. The facts "do not merge as assault and homicide can coalesce." State's brief at 61. *See State v. Bernal*, 148 Ariz. 149, 150, 713 P.2d 811, 812 (1985).

Under the facts of this case we find no error.

### I. *"Hash" Instruction*

■ A *Hash* instruction conveys the idea "[t]hat no person should be convicted upon suspicion or mere probability or from the fact that he may have had an opportunity to commit the crime." *Hash v. State*, 48 Ariz. 43, 58, 59 P.2d 305, 311 (1936). The trial court in this case instructed the jury on the need for the state to prove its case beyond a reasonable doubt and further instructed that "[t]he term reasonable doubt means a doubt based upon reason. This does not mean an imaginary or possible doubt.... It is the law that no verdict of guilty can stand on mere suspicion, probabilities or suppositions, for these alone do not warrant a conviction."

Defendant asserts that the trial court's reasonable doubt instructions were incomplete and that he was entitled to more under *Hash*. As long as the basic concept is covered, all of the *Hash* language need not be given. *See State v. Cookus*, 115 Ariz. 99, 104, 563 P.2d 898, 903 (1977). Here, the *Hash* concept was adequately communicated to the jury.

### J. *Felony Murder Instructions*

Defendant contends the state failed to produce sufficient evidence to support a charge of burglary and, therefore, burglary may not serve as a predicate felony for felony murder. As we have previously stated, the evidence was adequate to support a burglary instruction.

### 7. Separate Verdict Forms

■ Defendant argues that we should overrule prior case law and hold that a first

degree murder verdict is constitutionally deficient unless there is a unanimous jury finding on a single *theory* of first degree murder. We have previously rejected this argument in *State v. Lopez*, 163 Ariz. 108, 111–12, 786 P.2d 959, 962–63 (1990), as has the United States Supreme Court in *Schad v. Arizona*, — U.S. —, —, 111 S.Ct. 2491, 2504, 115 L.Ed.2d 555, 568 (1991). We again reject it.

8. Death Qualification of Jury

■ In this case the trial court "death-qualified" the prospective jurors. Ultimately, 2 jurors were excused after it was established that their attitudes on the death penalty would likely impinge on their ability to sit fairly on the issue of guilt. Although defendant raised no objections in the trial court, he now argues that the law in Arizona should be changed so as to preclude "death-qualification" of jurors in capital cases. Absent fundamental error, the issue has been waived and there is, in any event, no error, fundamental or otherwise. *State v. Atwood*, 171 Ariz. 576, 584, 832 P.2d 593, 641 (1992); *State v. Martinez–Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985).

9. The Death Penalty

 A. *Constitutionality of the Death Penalty Statute*

Defendant first argues that Arizona's death penalty statute, A.R.S. § 13–703, is unconstitutional because it: (1) provides for sentencing by a judge rather than by a jury; (2) places the burden of proof on defendant to prove mitigating circumstances; and (3) presumes the death penalty to be the appropriate sentence if one or more statutory aggravating circumstances is proved. This court has recently rejected these arguments. *See State v. Brewer*, 170 Ariz. 486, 497–98, 826 P.2d 783, 784–85, *cert. denied*, — U.S. —, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992); *see also Walton v. Arizona*, 497 U.S. 639, 647–652, 110 S.Ct. 3047, 3054–56, 111 L.Ed.2d 511, 524–27 (1990), *aff'g State v. Walton*, 159 Ariz. 571, 769 P.2d 1017 (1989).

Defendant's argument that the aggravating circumstance of cruel, heinous and depraved is unconstitutional was rejected by the Supreme Court in *Walton*, 497 U.S. at 655, 110 S.Ct. at 3058, 111 L.Ed.2d at 529. Defendant's argument that the statute is arbitrarily applied because it fails to provide sufficient guidance to trial courts was rejected in *State v. Correll*, 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986). Defendant's argument that the death penalty statute is discriminatory in application was rejected in *State v. Blazak*, 131 Ariz. 598, 602, 643 P.2d 694, 698, *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). Defendant's argument that the death penalty constitutes cruel and unusual punishment was rejected by this court in *Blazak*, 131 Ariz. at 601, 643 P.2d at 697, and by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859, 882 (1976).

Defendant's argument that the statute does not adequately restrict a prosecutor's decision to seek the death penalty was rejected by the Supreme Court in *Gregg*, 428 U.S. at 199, 96 S.Ct. at 2937, 49 L.Ed.2d at 889 (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); *see also State v. Harding*, 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). Defendant's further arguments that the death penalty is imposed arbitrarily and irrationally in Arizona because of prosecutorial discretion and was imposed arbitrarily in this case are merely restatements of arguments addressed above.

Defendant also argues that the trial court should have conducted a proportionality review. We have held that trial courts should *not* conduct such a review. *State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991) (citing *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977)).

 B. *The Death Penalty as Applied to Defendant*

 1. *A.R.S. § 13–703(F)(6), Especially Heinous, Cruel or Depraved*

■ Defendant first argues that the murder was not cruel because the medical

412

evidence shows a probability that the victim lost consciousness before her death. Cruelty involves the pain and suffering of the victim, including mental distress suffered prior to death. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The medical examiner who performed the autopsy testified that the victim had defensive wounds on her arms and hands, was beaten so severely that she suffered a cranial hemorrhage and broken nose, and was strangled with a phone cord so fiercely that it fractured her thyroid cartilage (Adam's apple). Although the medical examiner did not testify directly regarding the victim's degree of consciousness, the presence of defensive wounds on the victim and scratches on the defendant's chest indicate that the victim was conscious through some considerable portion of her agony. Our review of the evidence leads us to agree with the trial court's finding of cruelty.

 Defendant also challenges the trial court's findings that the crime was heinous and depraved. In determining whether a crime is heinous or depraved we focus on the defendant's mental state and attitude as evidenced by his words and actions. *State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990). We look at five factors: (1) did defendant relish the murder; (2) did he needlessly mutilate the victim; (3) did he commit gratuitous violence beyond that necessary to kill; (4) whether the victim was helpless; and (5) whether the crime was senseless. *Id.*

 The victim was a fragile, partially blind 83-year-old woman who weighed less than 90 pounds. She was totally helpless and at the complete mercy of her younger and stronger assailants. She was brutally beaten and then strangled with a force that not only killed her but crushed her Adam's apple and caused her to hemorrhage about the neck. The trial court made detailed findings which are included in the Appendix to this opinion. *See* Appendix at 420–421, 844 P.2d at 587–588. We agree with those findings, while also noting that any one of the three elements

(cruelty, heinousness, depravity) is sufficient to constitute an aggravating circumstance under A.R.S. § 13–703(F)(6). We find no error.

### 2. Mitigating Factors

 Defendant asserts that the trial court erred in finding that the mitigating circumstances were not sufficiently substantial to call for leniency. In addition to the specific factors listed in A.R.S. § 13–703(G), the sentencing court must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate." *State v. McCall*, 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). It is within the discretion of the trial court in the first instance, however, to determine how much weight is given to the proffered mitigating circumstances. *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). The burden is on the defendant to prove the existence of mitigating circumstances by a preponderance of the evidence. *Id.*

Defendant asserts that the following factors were present and should result in a sentence of life imprisonment: (1) defendant was possibly convicted only on a felony murder theory; (2) defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired; (3) defendant was a relatively minor participant in the crime; (4) the victim's death was not reasonably foreseeable; and (5) defendant was young—22 at the time of the offense and 24 when sentenced to death.

On appeal "we must independently review the record to determine the absence or existence of both aggravating and mitigating circumstances ..." *State v. Gillies (Gillies I)*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). We discuss each of the potentially mitigating factors separately.

#### a. The Felony Murder Instruction

 Defendant argues that the trial court erred in failing to find its felony murder instruction to be a controlling miti-

gating circumstance. The trial court did consider this factor and, in that connection, made the following findings:

Considering the possibility of other mitigating factors, Court finds the following mitigating factors:

. . . . .

Number 3, the felony-murder instruction that was given to the jury;

Number 4, the question as to whether the Defendant did the actual strangulation.

The Court finds as to Mitigating Factors 3 and 4 the following additional findings: The Defendant Salazar was a major participant in the felony committed, and that his involvement led to either the actual participation in the strangulation or the other violence perpetrated on the victim, or indicated reckless indifference to human life by the Defendant's actions, when in his presence the victim was being murdered.

In this connection, however, the Court notes the fingerprints of Defendant Salazar in what appeared to be blood and the fresh scratches observed shortly after the incident on the Defendant's chest.

Further, the Court notes his disposing of his shoes shortly after he left the house. This is contrasted to his story wherein he indicated in the trial that he left prior to any violence being perpetrated on the victim.

Appendix at 420–421, 844 P.2d at 587–588.

In *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Supreme Court held a death penalty may properly be imposed if a defendant convicted of felony murder was a major participant in the predicate felony and acted with reckless disregard for human life. Clearly, this case falls at least within the *Tison* ambit. We note, but reject, defendant's rather summary assertion that *Tison* cannot apply to him because the *Tison* opinion was issued after the date of defendant's crime and, therefore, to apply it here would violate *ex post facto* principles. *Tison* is one of a continuum of cases determining who is constitutionally death-eligible. If *Tison* can be applied to Tison himself in

accordance with the Supreme Court's remand, we know of no reason why it cannot also be applied to the defendant here.

b. Intoxication

Intoxication which significantly impairs a defendant's capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of law may be a mitigating circumstance. *State v. Zaragoza*, 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983). The trial court considered but rejected intoxication as a significant mitigating circumstance. We agree with the trial court that defendant has failed to prove this particular circumstance.

At trial, two witnesses testified that defendant did not appear to them to be intoxicated on the night of the murder. Defendant testified that he had been drinking heavily on the night of the murder and that, while in the victim's home, he was so drunk he was stumbling over furniture. Yet he testified in detail about what went on in the house and how he ran from the house in terror after seeing a ghost. He remembers in which hand he was holding the lighter he used to guide himself through the darkened house. He was thinking clearly enough to discard his shoes so that they could not be matched to the prints he knew he had made at the house. Such an act clearly suggests that he did appreciate the wrongfulness of his conduct. *Cf. Zaragoza*, 135 Ariz. at 71, 659 P.2d at 30. The evidence indicates that defendant was not significantly impaired and that he did clearly appreciate the wrongfulness of his conduct.

c. Degree of Defendant's Participation

Physical evidence negates defendant's attempt to downplay his degree of participation in the crime. We agree with the trial court's conclusion that defendant was a major participant in the crime.

d. Foreseeability of the Victim's Death

Defendant argues that he entered the victim's residence believing it to be

unoccupied; therefore, he did not foresee any grave risk of danger to anyone. There was ample evidence that the house was in fact occupied, and the trial court expressly found that defendant and Davis knew a frail old woman lived there. The jury, the sentencing court, and this court are not bound by defendant's version of the evidence. After entering the occupied house, defendant either personally beat and strangled the victim or, at the very least, watched or helped while Davis killed her. The trial court correctly concluded that unforeseeability of the victim's death was not a mitigating circumstance.

### e. Defendant's Age

■ Defendant argues that his age at the time of the offense, 22 years, is a mitigating circumstance. The trial court rejected the claim and so do we. We have found age not to be a mitigating circumstance in cases involving defendants the same age or younger than this defendant. *See, e.g., State v. Brewer,* 170 Ariz. at 506–07, 826 P.2d at 803–04 (age 22 not a mitigating factor); *State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (age 20 not a mitigating factor), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Gerlaugh,* 144 Ariz. 449, 460–61, 698 P.2d 694, 705–06 (1985) (age 19 not a mitigating factor). In this case defendant presents no evidence of how his youth caused him to lack "substantial judgment in committing the crime." *State v. Johnson,* 131 Ariz. 299, 305, 640 P.2d 861, 867 (1982).

■ We may also examine defendant's maturity and past experiences in determining whether age is a mitigating factor. *Walton,* 159 Ariz. at 589, 769 P.2d at 1035 (citing *Gillies I,* 135 Ariz. at 513, 662 P.2d at 1020). He has an IQ of 95, which indicates average intelligence. Although defendant has no prior felony convictions, he has a history of 6 juvenile offenses and an adult misdemeanor record. One of the offenses involved attacking an elderly woman in an attempt to steal her purse. Defendant has a close and supportive family and did not suffer a disadvantaged childhood.

The trial court properly found that defendant's age was not a mitigating factor.

### 10. Assistance of Counsel

■ As previously noted, we stayed this appeal pending resolution of defendant's request for post-conviction relief. After an extensive evidentiary hearing, the trial court denied relief and also denied rehearing. Although the state contends that defendant's motion for rehearing was insufficient to preserve all of the claims of ineffective assistance which are now asserted, the state has responded to all of them and we shall deal with each of them. Before doing so we note that, to obtain relief, defendant must affirmatively show: (1) counsel's performance fell below an objective standard of reasonableness as defined by prevailing professional norms; and (2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Nash,* 143 Ariz. 392, 397, 694 P.2d 222, 227, *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984). We will find prejudice if defendant establishes a reasonable probability that the verdict might have been affected by the legal error of counsel. *See Walton,* 159 Ariz. at 592, 769 P.2d at 1038. If no prejudice is shown, the court need not inquire into counsel's performance. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

### A. *NLADA Standards*

■ Defendant argues that although William Redondo, an experienced lawyer, was appointed as trial counsel, Patrick Hurd, a less experienced lawyer, functioned as the primary or lead counsel. Defendant argues that Mr. Hurd's inexperience rendered his assistance ineffective. In this argument, defendant relies solely on standards urged by the National Legal Aid & Defender Association (NLADA) *Standards for the Appointment and Performance of Counsel in Death Penalty Cases* (1987). We need not decide whether Mr. Hurd did or did not meet the NLADA

"standards" because this court uses the *Strickland* test. If defendant satisfies the *Strickland* test, he is entitled to relief without regard to the NLADA. Conversely, if he does not satisfy the *Strickland* test, he is not entitled to relief whether or not his attorney meets the NLADA standards.

### B. *Death Penalty Challenge*

■ Defendant argues that trial counsel should have ascertained the basis for the prosecutor's decision to seek the death penalty and that his failure to do so rendered him ineffective. The record clearly shows the prosecutor's decision to seek the death penalty was based on two statutory aggravating circumstances, one of which was ultimately accepted by the court. The prosecutor disclosed, in written pleadings, the exact basis for seeking the death penalty long before the sentencing hearing. There is no obligation to do more, and defense counsel is not deficient for not trying to require more.

### C. *Contact With Client*

■ Defendant complains that counsel had insufficient pretrial contact with him and failed to keep him informed of the status of the case. Counsel is effective as long as there have been sufficient meetings for counsel to keep defendant informed as to the status of the case and represent him adequately. *State v. Watson,* 120 Ariz. 441, 450, 586 P.2d 1253, 1262 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979). Defendant provides no showing of prejudice.

### D. *Pre–Trial Motions*

Defendant alleges that counsel should have filed more pre-trial motions, but fails to show how failure to file additional motions prejudiced him. He asserts that counsel should not have withdrawn his motion in limine to exclude the testimony of Detective Perry Lowe. We have earlier noted that this decision could well be justified on tactical grounds. Lowe's testimony should not have been excluded in any event.

Defendant also argues that counsel should have attempted to have his high bail reduced, but makes no attempt to show prejudice.

### E. *Preparation for Trial*

Defendant argues that counsel was unprepared for trial. His real argument in this respect revolves around Victoria Bode's report and her subsequent testimony identifying the blood on the filing cabinet as human blood. He argues that counsel's alleged failure in this respect undermined the defense theory of the case and prohibited counsel from fully developing an intoxication defense. We have previously discussed the Bode report and testimony. The trial court, in considering this particular claim of ineffective assistance of counsel, observed:

> That the late discovery by the defense in the disclosure made by the State, that a print belonging to defendant Salazar was in blood: This print was found very near to 'where the victim's body was found. The claim is that if this had been discovered earlier, the defense could have changed their tactics. However, considering the existence of the fingerprint in that location, under all the circumstances of the case, the Court finds that whatever tactic had been employed regarding that evidence it is not reasonably probable that the result of the decision by the jury would have been changed. The Court notes further that in explanation of that evidence Salazar claimed to have suffered cuts on his hand. The type of blood was never established at the trial.

The trial court was in the best position to evaluate this contention. The trial court did not abuse its discretion in denying Rule 32 relief on the "Bode issue."

### F. *Ineffectiveness at Sentencing*

Defendant makes several arguments under this heading, none of which we find persuasive. He first complains that the pre-sentence report contained a recommendation for the death penalty from the victim's surviving sister. Defendant, without citation to any authority, boldly asserts

that "Arizona law forbids the inclusion of such statements in regard to capital cases." We need not decide the correctness of this dubious assertion because, in this case, the trial judge expressly stated that he did not consider the statement in considering the death penalty.

Defendant next contends that trial counsel was deficient for permitting the trial court to consider evidence from a pretrial hearing in co-defendant Davis' case. The problem with this argument is that the Davis pretrial hearing evidence was *not* considered by the trial court, a fact specifically found by the trial court in the Rule 32 proceedings.

■ Defendant next argues that counsel failed to adequately screen the sentencing witnesses and was, therefore, responsible for defendant's brother testifying that defendant could be explosively violent when drinking. The brother was interviewed by counsel and his comment at sentencing was unexpected. Counsel ameliorated the brother's testimony by bringing out that defendant's violence was usually in response to provocation. No deficiency or prejudice is shown.

Finally, defendant argues that counsel should have presented evidence from Dr. Crago on the effects of defendant's polysubstance abuse and emotional difficulties. In ruling on the Rule 32 petition, the trial judge made a detailed analysis of Crago's report and how it tied in to the overall picture. He concluded that Crago's testimony would likely have hurt defendant more than helped him. The trial court concluded that not calling Dr. Crago was both professionally reasonable and non-prejudicial. We agree.

## 11. Proportionality Review

■ For a number of years, this court has engaged in the practice of proportionality reviews in death penalty cases. *See, e.g., State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); *State v. White,* 168 Ariz. 500, 515–17, 815 P.2d 869, 884–86 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1199, 117

L.Ed.2d 439 (1992). Such reviews, however, are not constitutionally required. *Pulley v. Harris,* 465 U.S. 37, 43–44 and n. 6, 104 S.Ct. 871, 875–76 and n. 6, 79 L.Ed.2d 29, 36 (1984); *see also Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511, 530 (1990), and *State v. Serna,* 163 Ariz. 260, 269, 787 P.2d 1056, 1065 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 214, 116 L.Ed.2d 172 (1991). In addition to the lack of any applicable constitutional provision, no statute requires or suggests proportionality reviews in death cases.

Some members of the present court have questioned the desirability of continuing the practice of proportionality reviews. Recently, Justice Corcoran, in a comprehensive concurring opinion, ably set forth the history of proportionality reviews in Arizona and argued against their continued use. *See White,* 168 Ariz. at 517, 815 P.2d at 886 (Corcoran, J., specially concurring); *see also id.* at 524, 815 P.2d at 893 (Moeller, J., specially concurring). In the same case, Vice Chief Justice (now Chief Justice) Feldman marshalled the arguments in favor of retaining proportionality reviews in a special concurrence and recommended their continued use. *See id.* at 525, 815 P.2d at 894 (Feldman, VCJ., specially concurring).

Since *White* was decided, the court has unanimously rejected the concept of trial court proportionality reviews. *See State v. Greenway,* 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991). In *Greenway,* Justices Corcoran and Moeller, in special concurrences, argued that the same reasons that led the court to reject trial court proportionality reviews should also lead the court to reject appellate court proportionality reviews. *Id.* at 173, 823 P.2d at 40.

The instant case is the first death penalty case heard by the full court as presently constituted. It is therefore an appropriate case in which to revisit and to resolve the continuing discussion concerning proportionality reviews. In doing so, we are "mindful that precedents of the court should not lightly be overruled and certainly not for reasons so inconsequential as a change of personnel on the court." *State*

v. *Crowder*, 155 Ariz. 477, 483, 747 P.2d 1176, 1182 (1987) (Moeller, J., concurring in part and dissenting in part).

In fact, in the recent case of *State v. Lara*, 171 Ariz. 282, 830 P.2d 803 (1992), the court reluctantly followed a line of cases involving statutory construction, while recognizing that the court, as presently constituted, would probably have reached a different result if it were writing on a clean slate. In applying stare decisis in *Lara*, the court recognized that many intervening cases had been processed and concluded in reliance on the earlier statutory interpretation.

We deal here, however, not with the interpretation or application of a statutory or constitutional provision, but with a court-created and self-imposed procedure. In matters involving the court's own rules, we have recently observed that we have more latitude in reexamining earlier precedents than we have in other types of cases:

> In matters relating to the interpretation and application of court rules and procedures, this court must pay constant attention to developments in court procedures and changing circumstances in order to fulfill our constitutional role. *See* Ariz.Const. art. 6, § 5. In furtherance of this responsibility, we will reevaluate prior decisions regarding court procedures, where principles of stare decisis might counsel otherwise in substantive matters involving common law decision-making or statutory or constitutional interpretation. *See, e.g., State v. Mendoza*, 170 Ariz. 184, 823 P.2d 51 (1992) (overruling the interpretation of Rule 8.2(a), Ariz. R.Crim.P., 17 A.R.S., established for DUI cases in *Hinson v. Coulter*, 150 Ariz. 306, 723 P.2d 655 (1986)).

*Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992).

We are persuaded by Justice Corcoran's arguments in support of discontinuing proportionality reviews and we, therefore, adopt them. In the interest of brevity, we do not restate all the arguments for and against on this issue, but instead refer the interested reader to the three special concurring opinions in *White* and the concur-

ring opinions in *Greenway*, all of which have been cited above. Because of our conclusion, we have not conducted a separate proportionality review in this case, nor will we in future cases.

## DISPOSITION

The court will no longer conduct proportionality reviews in death penalty cases. In addition to the issues discussed in this opinion, we have searched the record for fundamental error pursuant to A.R.S. § 13–4035. We have found none. Accordingly, the judgments of conviction and the sentences are affirmed.

CORCORAN, J., concurs.

MARTONE, Justice, specially concurring.

I join the opinion of the court without reservation. I write only to state why I join the court in discontinuing proportionality reviews in death penalty cases.

All agree that proportionality reviews are not required by the federal or state constitutions. All agree that there is no express statutory authorization for proportionality reviews in Arizona. It is also clear that the practice of proportionality reviews in death penalty cases had its origin in the mistaken notion that because some other state's statute required them, so did the United States Constitution. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), put that erroneous notion to rest.

Two questions then arise. By what authority do we do them? Second, what good do they do? It seems plain and simple that there is no authority for conducting proportionality reviews in Arizona. No statute authorizes them. Our authority to perform them should be based upon something more than reliance upon prior judicial error.

But do they do any good? If I thought proportionality reviews would add one iota of trustworthiness to the capital sentencing process, then I could well understand, if not agree with, the view that we should ignore our lack of authority to perform

them. But any review of our cases, simple or exhaustive, belies the proposition that they do any good. This court has extraordinary power to review death sentences under existing statutes. See A.R.S. § 13–703. This court even substitutes its judgment for that of the trial judge, something anathema in any other context. Thus, existing statutes and existing practices already give this court ample opportunity to do justice in any given death case. Our cases reveal that proportionality reviews are judicial afterthoughts, mere appendages to already lengthy opinions. They are performed in a non-adversarial setting, without any pretense at real science. They require a court to engage in the alchemy of measuring degrees of depravity among a handful of selected cases. The pursuit of justice does not require us to engage in unauthorized false science.

FELDMAN, Chief Justice, specially concurring.

Respectfully, I concur in today's holding. I write separately to state my view that this court should not abandon proportionality review in capital cases. I have fully set out my reasoning in *State v. White*, 168 Ariz. 500, 525, 815 P.2d 869, 894 (1991) (Feldman, V.C.J., specially concurring), *cert. denied*, —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

In abandoning this "court-created" procedure and its accompanying precedent, the majority relies on *Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992), and observes that this court has wide latitude in re-examining authority that is a product of this court's rule making. *Salazar*, at 417, 844 P.2d at 584. I have no quarrel with the majority's conclusion that this court has relatively great leeway in reviewing precedent that concerns its own procedures.

*Hedlund*, however, was guided by "a recognition that the judicial process benefits from [a change] according flexibility and discretion to judges in their efforts to manage a large and complex caseload." 173 Ariz. at 144, 840 P.2d at 1009. Be-

cause I continue to believe that proportionality review serves an important and substantial function, I would not overrule prior precedent and discontinue its use. *See, e.g., State v. Fierro*, 166 Ariz. 539, 555–57, 804 P.2d 72, 86–88 (1990). Instead of surrendering to its shortcomings, *see White*, 168 Ariz. at 522–24, 815 P.2d at 891–93 (Corcoran, J., specially concurring), we should strive to achieve its indispensable objective: fairness when imposing the state's most severe penalty. *See generally* David C. Baldus, et al., *Arbitrariness and Discrimination in the Administration of the Death Penalty: A Challenge to State Supreme Courts*, 15 Stetson L.Rev. 133 (1986). By eliminating the safeguard of proportionality review, the court gains little, if anything; sacrifices the added protection and confidence provided by this procedure; and fails to adequately recognize judicial, indeed human, fallibility.

Justice Martone's concurrence takes the view that proportionality reviews should be discontinued because they

> are performed in a non-adversarial setting, without any pretense at real science. They require a court to engage in the alchemy of measuring degrees of depravity among a handful of selected cases. The pursuit of justice does not require us to engage in unauthorized false science.

*Salazar*, at 417, 844 P.2d at 584 (Martone, J., specially concurring). Implicit in this, I fear, is the idea that death penalty jurisprudence *is* some form of "real science" and that, in deciding who should live and who should die, courts do not "engage in the alchemy of measuring degrees of depravity." *See id.* To my observation, nothing could be further from the case.

The object of our death penalty jurisprudence is to try to separate the exceptional crime or criminal from the "normal" murder or murderer, for it is only the former that is death-penalty eligible. *Fierro*, 166 Ariz. at 548, 556, 804 P.2d at 81, 89. Thus, we must determine whether any aggravating circumstances are present that make

the defendant death eligible—for example, whether a killing was committed "in an especially heinous, cruel or depraved manner." A.R.S. § 13–703(F)(6). If there is some "real science" to separating "especially" heinous, cruel, or depraved killers from "ordinary" heinous, cruel, or depraved killers, it escapes me. It also has escaped the court. *Compare State v. Jimenez*, 165 Ariz. 444, 453–55, 799 P.2d 785, 794–96 (1990) (although heinous and depraved, the court held that the evidence was insufficient to find that a murder was especially cruel where the defendant strangled his five-year-old victim and left her under a bed but returned after hearing her cry to strangle her again), *with State v. Beaty*, 158 Ariz. 232, 237, 242, 762 P.2d 519, 524, 529 (1988) (court held that murder was especially cruel where defendant asphyxiated his thirteen-year-old victim by clamping his hand over her mouth, causing her to vomit), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708 (1989); *compare also State v. Chaney*, 141 Ariz. 295, 312–13, 686 P.2d 1265, 1282–83 (1984) (court held that murder was especially heinous, cruel, and depraved where the defendant shot his victim with an automatic weapon), *and State v. Johnson*, 147 Ariz. 395, 397, 400–01, 710 P.2d 1050, 1052, 1055–56 (1985) (court held that senseless murder was not especially heinous, cruel, or depraved where the defendant killed his victim with a shot gun blast while the victim lay sleeping). The very use of the term "especially" in A.R.S. § 13–703(F)(6) requires comparison of one crime or criminal to others—a question of proportionality.

Although choosing between life and death is better left to divine judgment, we are bound by law to do it. We must do what the law commands, but, in doing so, we should not pretend we apply rules of logic and science. In Arizona, for instance, one becomes death eligible when killing to rob but not when killing to rape. *See* A.R.S. § 13–703(F)(5). One becomes death eligible if, hand trembling because of fear, mental illness, or drug use, one fails to aim accurately or kill with the first blow and the victim fortuitously suffers and dies slowly. *See Chaney*, 141 Ariz. at 312, 686 P.2d at 1282 (affirming death penalty in case where the defendant's gunfire did not kill the victim instantaneously, but, instead, the victim suffered for thirty minutes before losing consciousness and dying). The assassin who senselessly shoots with steady hand and kills in cold blood or uses a weapon with ruthless efficiency and dispatch and causes immediate death does not kill cruelly and may not be death eligible. *See Johnson*, 147 Ariz. at 397, 400–01, 710 P.2d at 1052, 1055–56 (cruelty not even considered where the defendant shot his sleeping victim, who "rapidly bled to death"). If this, too, is "real science," its logic escapes me.

The truth of the matter is that in determining whether to impose the ultimate penalty, we must compare the case before us with others. Why else all those case citations in determining what is "especially heinous, cruel or depraved"? *See, e.g., Jimenez*, 165 Ariz. at 453–55, 799 P.2d at 794–96; *State v. Hinchey*, 165 Ariz. 432, 437–39, 799 P.2d 352, 357–59 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1589, 113 L.Ed.2d 653 (1991); *Beaty*, 158 Ariz. at 242–43, 762 P.2d at 529–30; *Johnson*, 147 Ariz. at 400–01, 710 P.2d at 1055–56; *State v. Wallace*, 151 Ariz. 362, 366–67, 728 P.2d 232, 236–37 (1986), *cert. denied*, 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987); *Chaney*, 141 Ariz. at 312, 686 P.2d at 1282; *State v. Brookover*, 124 Ariz. 38, 40–41, 601 P.2d 1322, 1324–25 (1979); *State v. Lujan*, 124 Ariz. 365, 372, 604 P.2d 629, 636 (1979). Proportionality review is simply another form of comparison entailing no more "alchemy" than the rest of our capital jurisprudence. It is a tool by which the court can compare and remedy injustice when, as, and if it is perceived. It is wrong to discard this tool, especially if we do so under the illusion that we will thereby return to some scientific method of capital punishment. We are not smart enough to know the answer to the age-old question of who should live. It is one that can be correctly answered only with divine knowledge of proportionality and purpose. Because we must stumble on with human intelligence, we should use every tool in our possession to hold error and injustice to a minimum.

ZLAKET, J., concurs.

## APPENDIX

The Court finds beyond reasonable doubt that the Defendant committed the offense in an especially heinous or cruel manner, in that the evidence shows that the Defendant and Mr. Davis went to the house in the middle of the night where they knew a frail, elderly woman lived; that they removed the wrought iron on the window that had been placed there for her protection; that at the time that this was occurring, the television was on.

So, the Court determines that there is no doubt that the men knew that the residence was occupied at that point.

The Defendant then went to a relatively secluded part of the residence where she slept.

The Court further finds that the position of the bedroom or sleeping area was such that you could not just accidentally run into her because it was in a relatively secluded portion of the house with only one way to get there.

The Court finds that this was not an accidental interaction with the victim.

The Court further notes that there was a large number of file cabinets and other storage places in the house.

The footprints of two different individuals that were found somewhere on her were—were on her body. Some footprints were on the top of the table wherein the body was found and the footprints were left by different type shoes.

There were a number of file drawers opened and there were numerous and varied areas where valuables, if she had any, could have been hidden.

The Court further notes that there were a number of injuries to [the victim] implying a number of blows to her face and body, including a blow to her forehead, one behind her ear, one to her mouth, one under the chin, and a blow to her shoulder.

She was a frail person weighing approximately eighty-nine pounds, and was approximately eighty-three years of age.

She was strangled with a telephone cord after the beating, and the telephone cord was looped twice around her neck with great force.

Fingerprints or palm prints of the Defendant Davis and the fingerprints of the Defendant Salazar in what appeared to be blood were found immediately adjacent to where the strangled body was located.

Of the two different kinds of footprints that were found on the table where the body lay, one set was on her body. The other footprint was left on the table where she had been stepped on, and there was an imprint on the arm and the table.

The Court further notes that in addition to Mr. Salazar's fingerprints that was left in what appeared to be blood, there were scratches on his chest.

Either cruelness of mind or depravity was exhibited by the placement of the telephone back on the receiver while the cord was entwined around [the victim's] throat.

The Court finds that the forensic evidence indicates that this was a planned, calculated attempt to go to her bedroom. And I believe what occurred afterwards was an attempt to extract, if possible, information of where imagined valuables were hidden. That explains in this Court's view the number of blows and injuries she suffered before she was strangled.

Under those circumstances, the Court finds that this was an especially cruel, heinous or depraved murder because of the excessive amount of gratuitous violence on the victim, the senselessness of the murder and the helplessness of the victim.

The Court further finds no mitigating circumstances as set forth in ARS 13–703 as amended, Subsection G, Paragraphs 1 through 5.

The Court has considered specifically Section 13–703(G)(3).

. . . .

Court, after considering that as a potential mitigating factor, finds that the preponderance of evidence does not show that the Defendant was not present at the time of the murder.

The facts and circumstances of how the entry was made, where the bedroom was, and the footprints and fingerprints of both Defendants instead show beyond reasonable doubt that both were present when [the victim] was murdered.

Considering the possibility of other mitigating factors, Court finds the following mitigating factors:

Number 1, the Defendant's lack of a prior felony conviction;

Number 2, the fact that alcohol and perhaps other substances were used prior to the break-in;

Number 3, the felony-murder instruction that was given to the jury;

Number 4, the question as to whether the Defendant did the actual strangulation.

The Court finds as to Mitigating Factors 3 and 4 the following additional findings: The Defendant Salazar was a major participant in the felony committed, and that his involvement led to either the actual participation in the strangulation or the other violence perpetrated on the victim, or indicated reckless indifference to human life by the Defendant's actions, when in his presence the victim was being murdered.

In this connection, however, the Court notes the fingerprints of Defendant Salazar in what appeared to be blood and the fresh scratches observed shortly after the incident on the Defendant's chest.

Further, the Court notes his disposing of his shoes shortly after he left the house. This is contrasted to his story wherein he indicated in the trial that he left prior to any violence being perpetrated on the victim.

The Court finds that under those circumstances that the mitigating factors are not sufficiently mitigating to outweigh the aggravating factors found by the Court beyond reasonable doubt.